**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | Crim. No. 14-710 |
| v. | **OPINION** |
| DONALD BERNARD SR., | |
| *Defendant*. | |

**John Michael Vazquez, U.S.D.J.**

This matter comes before the Court by way of Defendant Donald Bernard Sr.'s motion to modify his sentence and for immediate compassionate release. D.E. 60. Bernard filed his original motion *pro se*, but counsel thereafter filed a supplemental motion on his behalf. D.E. 63. The Government filed opposition to both, D.E. 62, 64, to which Bernard replied, D.E. 65. The Court reviewed the parties' submissions[1] and considered the motion without oral argument pursuant to Local Criminal Rule 1.1 and Local Civil Rule 78.1(b). Defendant seeks immediate release due to the ongoing COVID-19 pandemic. For the following reasons, Defendant's motion is denied.

---

[1] Defendant's *pro se* brief in support of his motion is referred to as "Br." (D.E. 60); Defendant's supplemental brief is referred to as "Supp. Br." (D.E. 63); the Government's initial opposition brief is referred to as "Opp." (D.E. 62); the Government's opposition to Defendant's supplemental brief is referred to as "Supp. Opp." (D.E. 64); and Defendant's reply brief is referred to as "Reply" (D.E. 65).

## I.     BACKGROUND

### A.  Underlying Criminal Proceeding

In December 2014, Defendant was indicted in connection with his work as a consultant with, and later employee of, the Newark Watershed Conservation and Development Corporation ("NWCDC").  D.E. 1.  The NWCDC was a not-for-profit organization owned by the City of Newark, New Jersey; the NWCDC operated Newark's water assets through several service contracts.  The NWCDC was primarily funded through tax dollars.  The gist of the indictment was that Bernard secured NWCDC work for contractors in exchange for kickbacks.  The total amount of ill-gotten funds was approximately $1 million, and Bernard did not pay taxes on his kickback monies.

In January 2016, Bernard pled guilty pursuant to a plea agreement.  D.E. 11-13.  Bernard confessed guilt to Counts 9 and 10 of the Indictment, which charged him with violations of 18 U.S.C. § 1952(a)(3) (based on bribery in N.J. Stat. Ann. §§ 2C:21-10, 2C:27-2), and to an information charging him with a tax offense in violation of 26 U.S.C. § 7206(1).  Bernard was sentenced by Chief Judge Jose Linares on July 13, 2017.  D.E. 22.  Bernard faced a United States Guidelines range of 151-188 months but due to Bernard's substantial assistance to the Government, Chief Judge Linares sentenced him 96 months imprisonment.  D.E. 22, 23.  Bernard was also ordered to pay $1,157,120 in restitution.  D.E. 23 at 7.

Bernard is currently housed at FCI Schuylkill in Pennsylvania.  He began serving his sentence on December 15, 2017.  Bernard is currently scheduled to be released on October 7, 2024.

### B.  COVID-19 Pandemic

COVID-19 "is caused by the virus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a new virus in humans causing respiratory illness which can be spread from

person-to-person." *Coronavirus Background*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/non-us-settings/overview/index.html#background (last accessed Nov. 11, 2020). "COVID-19 is primarily transmitted from person-to-person through respiratory droplets. These droplets are released when someone with COVID-19 sneezes, coughs, or talks." *Id.* Persons who contract the virus reflect a wide range of symptoms from asymptomatic to mild (including fever, cough, nausea, chest pain, and body pain) to severe to critical (including respiratory failure and death). *Id.* Currently, there is no known cure for COVID-19. As a result, standard precautions to prevent the spread of the virus include social distancing, proper hygiene, personal protective equipment (including use of a face mask), and cleaning of surfaces and devices. *Id.*

Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. As a person get older, his/her risk for severe illness from COVID-19 increases. *Coronavirus Disease 2019 – Older Adults,* CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed Nov. 11, 2020). For example, persons in their sixties and seventies are at a higher risk than people in their fifties. *Id.* Those eighty-five or older are at greatest risk. *Id.*

The following medical conditions put a person at increased risk of severe illness from COVID-10: cancer, chronic kidney diseases, chronic obstructive pulmonary diseases, heart conditions such as coronary artery disease, weakened immune system from organ transplant, obesity, pregnancy, sickle cell disease, smoking, and type 2 diabetes mellitus. *Coronavirus Disease 2019 – People With Certain Medical Conditions,* CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed Nov. 11, 2020).

Persons who have the following medical conditions might be at an increased risk:  asthma, cerebrovascular disease, cystic fibrosis, hypertension, immunocompromised state, neurologic conditions, liver diseases, pulmonary fibrosis, thalassemia, type 1 diabetes mellitus.  *Id.*

Finally, racial and ethnic minorities may also be at an increased risk due to societal inequities, such as to access to health care and poorer living conditions.  *Coronavirus Disease 2019 – Health Equity Considerations & Racial & Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html   (last accessed Nov. 11, 2020).  Factors to be considered are discrimination; healthcare access and utilization; occupation; educational, income, and wealth gaps; and housing.  *Id.*

As of November 11, 2020, the United States had 10,170,846 COVID-19 cases, which resulted in 239,590 deaths.  *COVID Data Tracker*, CDC, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days  (last accessed Nov. 11, 2020).

### 1.  Federal Bureau of Prisons

The Federal Bureau of Prisons ("BOP") has taken the following steps to combat the virus. On March 13, 2020, the BOP modified its operations in accordance with its "COVID-19 Action Plan."   *Federal   BOP   COVID   Action   Plan*,   BOP, https://www.bop.gov/resources/news/20200313_covid-19.jsp   (last accessed Nov. 11, 2020). Initially, all social visits, inmate movement, and official staff travel were suspended for thirty days. *Id.*  Contractors who enter any BOP facility are screened for the virus, and initially admission was limited to contractors who performed essential services.  *Id.*  The BOP also conducts enhanced health screening for staff in areas of "sustained community transmission."  *Id.*  The BOP screens all new inmates for virus "exposure risk factors and symptoms."  *Id.*  Any new inmate who is asymptomatic but who has had a risk of exposure is quarantined.  *Id.*   According to the

Government, the quarantine period is for a minimum of fourteen days or until cleared by medical staff.  Opp. at 5.  The Government indicates that new inmates who are symptomatic are placed in isolation until they test negative for the virus or are cleared by medical staff.  *Id.*  The Government also states that the BOP has taken the following steps to prevent the spread of the virus:  group gatherings are limited to permit social distancing as much as possible, all staff and inmates have been issued face masks, and all staff and inmates are strongly encouraged to wear face masks when social distancing cannot be achieved.  *Id.*

As of November 11, 2020, the BOP COVID-19 statistics are as follows:  (1) currently 2,455 inmates and 981 staff have presently have confirmed positive tests; (2) 17,067 inmates and 1,543 staff have recovered; and (3) 135 inmates and 2 staff have died.  *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/index.jsp (last accessed Nov. 11, 2020).  FCI Schuylkill, where Defendant is housed, has fortunately fared better.  When Bernard made his initial motion, FCI Schuylkill did not have any reported cases.  As of November 11, 2020, FCI Schuylkill has 4 positive cases among staff as well as 1 inmate and 1 staff member who have recovered.  *Id.*

### 2.  New Jersey

New Jersey has been particularly hard hit by the pandemic.  New Jersey has taken numerous affirmative steps, such as the Governor's stay-at-home order issued on March 21, 2020, to combat the virus.  In addition, New Jersey initially closed schools indefinitely and closed beaches, state parks, and county parks. When the number of New Jersey cases started to decline, many of the initial restrictions were lifted or relaxed.  However, New Jersey is now facing another uptick in positive cases, and the Governor recently issued new mitigation orders. *Announcements*, NEW JERSEY COVID INFORMATION HUB, https://covid19.nj.gov/faqs/announcements/all-announcements/governor-murphy-announces-new-covid-19-mitigation-measures  (last accessed

Nov. 11, 2020). As of November 11, 2020, New Jersey has 263,495 cases and a resulting 14,676 deaths. *Data Dashboard*, NEW JERSEY COVID INFORMATION HUB, https://covid19.nj.gov/ (last accessed Nov. 11, 2020). Essex County, where Defendant indicates he would live if released, has had 28,451 cases with 1,931 deaths, including 360 new cases. *Id.*

### C. Bernard's Relevant Activities and Conditions

Defendant is 72 years old. He suffers from hypertension and obesity; he is also pre-diabetic.[2] As a result, the BOP has him categorized as "undesignated medical," which exempts him from regular inmate duties. It appears that Defendant has been a model inmate and also completed several educational and spiritual programs offered by FCI Schuylkill. Finally, the current offense was his apparently his first.

On March 30, 2020, Bernard wrote to the Warden of FCI Schuylkill, seeking his release for the same reasons he raises now. D.E. 60 at 18-19. On April 3, 2020, the Warden denied Defendant's request. *Id.* at 20-21. This suit followed.

## II.    LEGAL STANDARD

Following the passage of the First Step Act, Section 3582(c)(1)(A) now reads as follows:

(c) Modification of an imposed term of imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after

---

[2] Defendant also list other medical conditions, Br. at 2, such as to his prostate and heel spurs, which do not appear to put him at a greater risk should he contract COVID-19.

considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) *extraordinary and compelling reasons warrant such a reduction*; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

*and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*; and

(B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and

(2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphases added).  The parties agree that Defendant has satisfied the statutory exhaustion requirement.  Opp. at 4.

The applicable policy statement of the United States Sentencing Commission is found in Section 1B1.13.  U.S.S.G. § 1B1.13.  The application notes to the section provide four circumstances that can be considered extraordinary and compelling:  (1) the medical condition of the defendant, (2) the age of the defendant, (3) family circumstances, and (4) other circumstances constituting an extraordinary or compelling reason, either considered alone or in combination with any of the other three stated reasons.  *Id.* cmt. n. 1(A)-(D).

In the application note, the fourth consideration requires a determination of the Director of the BOP. *Id.* cmt. n. 1(D). Here, the Government does not contest that the policy statement should also apply when the motion is filed by a defendant, in addition to a motion filed by the BOP Director. The Court finds that the policy statement applies here, although this has been a point of contention in similar cases. In *United States v. Rodriguez*, 451 F. Supp. 3d 392 (E.D. Pa. 2020), United States District Judge Anita Brody confronted the same issue. Ultimately, Judge Brody held that the fourth provision also applies when the motion is made by a defendant. *Id.* at 400. Judge Brody noted that her determination was in accord with the majority view. *Id.* at 397 (collecting cases). Judge Brody also persuasively explained her decision as follows:

> Under the First Step Act, however, it is possible for inmates to file compassionate-release motions—under the 30-day lapse provision—when their warden *never* responds to their request for relief. Thus, Congress specifically envisioned situations where inmates could file direct motions in cases where nobody in the BOP *ever* decided whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to *all* motions.

> It would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond in such a situation could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard. . . . This would have the perverse effect of *penalizing* prisoners who take advantage of the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay that the Act sought to alleviate.

> That would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate

release applications.”). . . .  Congress sought to help, not hinder, these sorts of prisoners . . . .  Nothing in the text of the old policy statement calls for it, since that statement expressly limits itself to motions filed by the BOP and was written before this situation was even possible to envision.

Adopting the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and shifting definition of the term “extraordinary and compelling.”  Because the Sentencing Commission has not issued a policy statement addressing post-First Step Act procedures, it certainly has not mandated that courts take such an approach. Accordingly, as a result of the First Step Act, there is simply a procedural gap that the Sentencing Commission—currently lacking a quorum and unable to act—has not yet had the chance to fill.   Nothing in § 3852(c)(1)(A)(i) requires courts to sit on their hands in situations like these. Rather, the statute’s text directly instructs *courts* to “find that” extraordinary circumstances exist.

*Id.* at 399-400 (emphases in original).

Pursuant to Section 3582(c)(1)(A), the Court must also consider the factors listed in 18 U.S.C. § 3553(a).  They include the nature and circumstances of Defendant’s offense, the history and characteristics of Defendant, the need for the sentence to provide just punishment, and the need to protect the public from future offenses of Defendant.  *Id.*

## III.  ANALYSIS

Bernard indicates that in light of the pandemic, he should be released because of his age and medical conditions.  Br. at 2-3; Supp. Br. at 1, 3, 5, 7-11, 18-23.  Bernard also notes that he is a non-violent offender who has not had any incident reports while incarcerated; he is at a lower risk to reoffend.  Supp. Br. at 1, 27-29.  Bernard further notes that he has taken affirmative steps to educate and rehabilitate himself while in prison.  *Id.* at 2, 30.  Defendant acknowledges that while FCI Schuylkill has not had many positive cases, this statistic is undercut by the BOP’s inadequate testing regimen, among other deficiencies.  *Id.* at 10-18; Reply at 1-3.  Defendant

initially offered a release plan in which he would reside in West Orange, New Jersey.  Br. at 7.

Defendant now indicates that he would reside in Newark.  Supp. Br. at 29.

In opposition, the Government points to the seriousness of Defendant's offense.  Opp. at

17.  The Government continues that the pandemic, standing alone, does not warrant release.  Opp.

at 12.  The Government also points to the affirmative steps taken by the BOP to combat the virus,

the low number of positive cases at FCI Schuylkill, and that the area to which Defendant seeks to

be released presents a much higher risk to Bernard as to contracting the virus.  Opp. at 16; Supp.

Opp. at 3.

While certain factors militate in Bernard's favor, the Court ultimately concludes that

Defendant has not met his burden in demonstrating extraordinary and compelling reasons to justify

his release.  The nature and circumstances of the offense are quite serious.  Any breach of the

public trust is improper, but Bernard enriched himself to the detriment of the taxpayers.  Bernard

also received a substantial downward departure when he was sentence due to his cooperation.  And

while Bernard is now seventy-two, he committed the offenses when he was already over sixty.  In

addition, Bernard has served less than 50% of the sentence, which factors against his request.  *See*

*United States v. Pawlowski*, 967 F.3d 327, 330-31 (3d Cir. 2020) (ruling that in deciding a motion

for compassionate release, a district court may consider the amount of time remaining on a

defendant's sentence).  On this point, the Third Circuit has made the following observation:

> We have not previously considered whether a district court abuses
> its discretion by denying a motion for compassionate release based
> on the amount of time remaining to be served in the inmate's
> sentence.  But numerous district courts have taken this into account
> in considering whether to grant compassionate release.  *See, e.g.,*
> *United States v. Bogdanoff*, [] 459 F. Supp. 3d 653 (E.D. Pa. May 8,
> 2020) (denying compassionate release where the inmate had served
> only seven years of an 18-year sentence, and noting that the case
> was "much different than others where defendants [sought
> compassionate release] at the end of their sentence"); *United States*

*v. Moskop*, No. 11-cr-30077, 2020 WL 1862636, at *1–2 (S.D. Ill. Apr. 14, 2020) (denying compassionate release where the inmate had served less than 10 years of a 20-year sentence and explaining that the "sentencing objectives of specific deterrence and protecting the public [would] not [be] fully served by less than 10 years of incarceration"). And at least one of our sister circuits has approved that consideration. *See* [*United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020)] (holding that a district court did not abuse its discretion in denying compassionate release based, in part, on the defendant's having served only 14 years of a 30-year sentence). We agree, as this consideration is consistent with the text of 18 U.S.C. § 3582(c)(1)(A), which, again, requires a court reviewing a motion for compassionate release to "consider[ ] the factors set forth in [§] 3553(a) to the extent that they are applicable." Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing, the time remaining in that sentence may—along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates—inform whether immediate release would be consistent with those factors. Hence we cannot conclude that the District Court acted unreasonably in determining that the substantial sentencing reduction required for granting compassionate release here—a reduction from 15 years to less than two years—would be inconsistent with the § 3553(a) factors.

*Id.* at 330-31 (footnotes omitted).

At the same time, the fact that Bernard has otherwise led a law-abiding life cuts in his favor. In addition, his efforts while incarcerated – in the form of completing the various educational and spiritual programs offered – also weigh in his favor.

Turning to the pandemic, Defendant's hypertension puts in a more vulnerable category, as does his obesity. Bernard's age also potentially makes him more at risk of suffering an adverse outcome should he contract the virus. His pre-diabetes arguably makes him more vulnerable, although this factor is not currently listed by the CDC. All of these factors weigh in favor of Defendant's request.

11

However, the Court denies Defendant's motion not only due to the seriousness of his crimes and the time remaining on his sentence but also because FCU Schuylkill has not suffered any serious outbreak of positive cases. This fact is critical. When Defendant first filed his motion, the facility did not have any cases. Since then, there have been a total of four cases, with three of them involving staff. One of the staff members, as well as the lone inmate who tested positive, have recovered. Statistically, FCU Schuylkill is much safer for Defendant than Essex County, where he wishes to be released.

Bernard attacks the testing methods of the BOP. This may be a fair criticism, and the Court expected the Government to provide much more facility-specific information as to its actions vis-à-vis the pandemic. But Bernard has not presented any evidence that the reported cases at FCU Schuylkill are incorrect. Thus, it appears that the BOP's efforts, at least in regard to FCU Schuylkill, are currently working. Bernard also does not challenge the Government's information that staff, contractors, and new inmates are screened for the virus before entering. Once a facility is confident that its inmate population does not have the virus, it appears that preventing any positive cases from entering the facility – through screening – is crucial.

For the foregoing reasons, the Court denies Bernard's motion. However, the Court does so without prejudice. The pandemic, unfortunately, has been battering our country with a second surge, and circumstances could materially change.

## IV.    CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion without prejudice. An appropriate Order accompanies this Opinion.

Dated:  November 12, 2020

_____
John Michael Vazquez, U.S.D.J.